John SOLOMON, Plaintiff/Appellant,

v.

FloWARR MANAGEMENT, INC., d/b/a the Bradford Group, and Hospital Management Corporation, Defendants/Appellees.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

June 16, 1989.

Permission to Appeal Denied by
Supreme Court Sept. 25, 1989.

Joseph Y. Longmire, Jr., Kelly & Jones, Hendersonville, for plaintiff/appellant.

Alan Mark Turk, Prince & Turk, Nashville, for defendants/appellees.

## OPINION

KOCH, Judge.

This appeal involves the validity of a negotiated termination of an employment contract. The discharged employee sued his former employers in the Chancery Court for Davidson County seeking to set aside the release on the grounds of economic duress and to enforce his employment contract's golden parachute clause. The trial court granted the employers' motions for summary judgment and dismissed the employee's suit because he had failed to tender the money he had received for executing the release. The employee has appealed, insisting that the trial court should not have granted the summary judgment because of the material factual disputes concerning his economic duress claim. We affirm the trial court.

### I.

George B. Warren, Jr. ("Brad Warren") and his father, George B. Warren, Sr. are accountants from Birmingham, Alabama. In 1985, they formed an Alabama corporation called Hospital Management Corporation ("HMC")[1] in order to enter into a contract with one of their other corporations, FloWarr Management, Inc. ("FloWarr"), to open and operate five chemical dependency treatment centers FloWarr was building throughout Alabama.

Brad Warren hired John P. Solomon in January, 1986 as HMC's executive vice president and chief operating officer. Mr. Solomon had many years of experience operating hospitals and was employed as the executive director of an adolescent treatment facility in Nashville when he agreed to take the job with HMC. Mr. Solomon's job was to develop the treatment programs

---

1. HMC also called itself "The Bradford Group."

and then to open and operate all five treatment centers.

Mr. Solomon's January 16, 1986 employment contract was for three years and provided for an annual base salary of $75,000 as well as annual ten percent raises. Mr. Solomon also received an additional $20,000 in relocation expenses as well as a $9,000 loan which was to be repaid during the term of the contract at the rate of $250 per month. The contract also contained a golden parachute clause entitling Mr. Solomon to a payment equal to three times his annual salary if someone acquired a controlling interest in HMC and did not offer him an equal or better employment contract.

Mr. Solomon began work on February 1, 1986 and within approximately eight months staffed and opened facilities in Madison, Prattville, Daphne, Birmingham and Shelby County, Alabama. However, the Warrens soon became concerned about the future of the venture when patients did not materialize. In October, 1986, they sent a series of memoranda to Mr. Solomon complaining about the size of the administrative staff and the deficiencies in marketing and patient recruitment. The elder Mr. Warren warned that the shortage of patients was threatening to shut down the facilities.

In late 1986, the Warrens sold additional FloWarr stock to outside investors to raise additional operating capital. Along with their new investors, they also decided to consolidate the business by having FloWarr take over the management of the facilities. They began negotiating a new employment contract with Mr. Solomon in November, 1986. However, before the agreement could be finalized, another HMC employee told Brad Warren that the company's key employees were dissatisfied with Mr. Solomon's management style and that several employees would leave if he continued with the company.

During December, 1986, Brad Warren discussed Mr. Solomon's performance with other key employees to verify the information about Mr. Solomon. He discovered that they thought that Mr. Solomon

"managed by intimidation," that he was "authoritarian and dictatorial," that he was "unpredictable and erratic," and that he was "more interested in protecting his own position." This information prompted the Warrens and their outside investors to conclude that Mr. Solomon should not continue with the company. They decided to ask him to resign and to offer him six months severance pay.

On December 31, 1986, Mr. Solomon met with Brad Warren and Stanley B. Sikes, HMC's lawyer, at the company's headquarters near Birmingham. Mr. Warren told Mr. Solomon that he "no longer fit into [the company's] future plans" because his management style might cost the company several of its key employees and asked for Mr. Solomon's resignation. Mr. Sikes added that the company was prepared to pay Mr. Solomon six months severance pay and to maintain his family's health insurance for one year.

Mr. Solomon countered that he would resign if the company would agree to pay him an amount equal to three times his annual salary. Mr. Sikes informed Mr. Solomon that he had advised HMC that it had no obligation to pay Mr. Solomon anything because he had failed to live up to his contractual responsibility to faithfully perform his duties and to use his best efforts and judgment to supervise, manage, and operate the company's five facilities.

The meeting recessed for a time, and Mr. Solomon left Mr. Warren's office. When he returned, he stated that he would resign if the company would pay him for the two years remaining on his contract. Mr. Warren responded with an offer to pay one year's salary. Mr. Sikes pointed out that if the matter was not resolved, Mr. Solomon's only recourse would be to sue the company and, in that event, that the dispute would be "tied up for two or three years" and that Mr. Solomon would be responsible for the legal expenses he would incur.[2]

The discussion turned to other financial matters relating to Mr. Solomon's travel expenses, a house the Solomons had recent-

---

**2.** These statements form the factual basis for Mr. Solomon's economic duress claims.

ly purchased in the Birmingham area, and a new car Mr. Solomon had just purchased at Mr. Warren's urging. Mr. Warren agreed that the company would pay the travel expenses and would pay an additional $6,000 to offset the cost of the car. The meeting adjourned again, and Mr. Solomon returned to his office to telephone his wife who arrived àt the office a short time later. After a brief discussion with his wife, Mr. Solomon agreed to prepare a letter of resignation in return for one year's salary, $6,000 for the car, the payment of his outstanding travel expenses, and the continuation of his family's health insurance for one year.

While Mr. Solomon prepared his letter of resignation, Mr. Sikes prepared a release by which Mr. Solomon agreed to forego all claims of any sort against HMC, FloWarr, and the Warrens arising out of the employment contract. Mr. Sikes took the release and a check for $81,000 to Mr. Solomon's office. He explained the release, and Mr. Solomon read and signed it. Mr. Sikes gave Mr. Solomon the check, shook his hand, and wished him good luck. The discussions between Mr. Solomon, Mr. Warren, and Mr. Sikes lasted approximately two and a half hours.

Mr. Solomon filed this action three months later. He sought to rescind the release by claiming that the defendants had obtained it through economic duress, and he insisted that his employment contract entitled him to a payment of three times the amount of his annual salary at the time he was discharged. He did not tender the $81,000 because he needed the money to support his family. However, he offered to credit the $81,000 against any judgment he might obtain. FloWarr and HMC denied liability, and HMC counterclaimed for $6,250—the unpaid balance of the $9,000 loan the company made to Mr. Solomon when he was hired.

Both HMC and FloWarr moved for a summary judgment to dismiss Mr. Solomon's suit on the grounds that he had signed a valid release and had failed to tender the $81,000 he had received after signing the release. HMC also sought a summary judgment on its $6,250 counterclaim. The trial court dismissed Mr. Solomon's claims against FloWarr and HMC because "[t]he [p]laintiff executed a [r]elease of all claims and has failed to tender the ... $81,000 paid by the [d]efendants in consideration for the execution of the release." The trial court also granted a summary judgment awarding HMC the $6,250 requested in its counterclaim.[3]

## II.

■ At the outset, we must decide whether Alabama or Tennessee law governs the validity of Mr. Solomon's release. Mr. Solomon has insisted throughout the proceedings that Tennessee law controls because he signed his employment contract in Nashville. We disagree. The validity of the release, not the validity of the employment contract, is at issue in this case. The release was negotiated and signed in Alabama, and therefore, Alabama substantive law controls.

Courts are presented with a difficult task when the contracting parties have not effectively chosen the substantive law that will govern their contractual obligations. *Deaton v. Vise,* 186 Tenn. 364, 371, 210 S.W.2d 665, 668 (1948); G. Stumberg, *Principles of Conflict of Laws* 225 (3d ed. 1963); 2 J. Beale, *A Treatise on the Conflict of Laws* § 332.1, at 1078 (1935).

The Tennessee Supreme Court has declined to join with the significant number of states[4] that have adopted the "center of gravity" approach embodied in Restatement (Second) of Conflict of Laws § 188(2) (1969). *Great Am. Ins. Co. v. Hartford Accident & Indem. Co.,* 519 S.W.2d 579, 580 (Tenn.1975). Thus, we are left to apply as best we can the traditional *lex loci contractus* rule—the construction and validity of a contract are governed by the law of

---

**3.** Mr. Solomon does not take issue with this portion of the trial court's opinion.

**4.** *See* E. Scoles & P. Hay, *Conflict of Laws* § 18.21. at 666–67 (1984).

the place where the contract was made.[5] *Ohio Casualty Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 466 (Tenn.1973); *Sloan v. Jones*, 192 Tenn. 400, 407, 241 S.W.2d 506, 509 (1951).

Using the traditional rule, the law of the place of contracting governs in determining whether a contract is void or voidable because of duress. *See* 2 J. Beale, *A Treatise on the Conflict of Laws* § 347.1 (1935). The release agreement was negotiated and signed in Alabama. It involved persons and corporations residing in Alabama, and it related to a contract the performance of which was primarily in Alabama. Accordingly, we will decide this appeal based on Alabama's substantive law.

■ The trial court based its summary dismissal of Mr. Solomon's complaint on Mr. Solomon's failure to tender back the money he received from the defendants in return for executing the release. Since we have decided to apply Alabama's substantive law, we must determine whether the tender requirement is substantive or procedural.

The Tennessee Supreme Court has defined substantive law as

> that part of the law which creates, defines, and regulates rights; that which creates duties, rights, and obligations; the law which relates to rights and duties which give rise to a cause of action.

*Spencer Kellogg & Sons, Inc. v. Lobban*, 204 Tenn. 79, 89, 315 S.W.2d 514, 518 (1958). It has also held that the tender rule is "part of the substantive law of rescission, and not a requirement peculiar to any particular form of procedure." *Wooley v. Gould, Inc.*, 654 S.W.2d 669, 673 (Tenn.1983).[6] It follows, therefore, that we must construe and give effect to the tender requirement as it exists under Alabama law.

## III.

Alabama courts look upon duress as a species of fraud. *Noel v. Noel*, 225 Ala. 302, 143 So. 469, 469 (1932). They have also held that duress has the same effect as fraud on a contract's validity and that it gives rise to similar remedies. *Royal v. Goss*, 154 Ala. 117, 45 So. 231, 232 (1907).

■ Parties who have been induced through duress to make an agreement have two alternative remedies. They may seek rescission of the agreement or they may affirm the agreement and sue for damages. *Mutual Savs. Life Ins. Co. v. Osborne*, 245 Ala. 15, 15 So.2d 713, 718 (1943). Those electing to affirm the contract and sue for damages are not required to return or offer to return the consideration they received. *Coastal Concrete Co. v. Patterson*, 503 So.2d 824, 830 (Ala.1987). However, those seeking to rescind the contract must return or be ready, willing, and able to return the consideration. *Ledbetter v. Frosty Morn Meats*, 274 Ala. 491, 150 So.2d 365, 371 (1963); *Gilbert v. Wilson*, 237 Ala. 645, 188 So. 260, 263 (1939).

Applying these principles to releases similar to the one Mr. Solomon signed, the Alabama Supreme Court has held that parties seeking to set aside a release must return or at least offer to return the consideration received in exchange for executing the release. *Boles v. Blackstock*, 484 So.2d 1077, 1083 (Ala.1986) (offer to return the consideration); *Edmondson v. Dressman*, 469 So.2d 571, 573 (Ala.1985) (tender a return of the consideration); *Jehle–Slauson Constr. Co. v. Hood–Rich Architect*

---

5. The Tennessee Supreme Court has carved out two exceptions to the general rule which are not applicable in this case. First, the Court has recognized that parties can choose to be governed by the law of a state other than the state where the contract is made. *Deaton v. Vise*, 186 Tenn. at 373, 210 S.W.2d at 668–69. Second, it has held that in certain situations, the law of the place of performance will be applied instead of the traditional rule. *Edgington v. Edgington*, 179 Tenn. 83, 92, 162 S.W.2d 1082, 1086 (1942).

6. Even though *Wooley v. Gould, Inc.* involved a worker's compensation claim, the Court found its authority in earlier cases which relied upon the general rule that one who seeks to set aside a settlement must, as a prerequisite, tender back the money received under the executed agreement sought to be avoided. *Lindsey v. Hunt*, 215 Tenn. 406, 422, 387 S.W.2d 344, 345–46 (1965) (opinion on second petition to rehear) citing *Gibbons v. Mutual Benefit Health and Accident Assoc.*, 195 Tenn. 339, 342, 259 S.W.2d 653, 654 (1953).

*and Consulting Eng'rs*, 435 So.2d 716, 719 (Ala.1983) (return the consideration). Accordingly, we conclude that Alabama law requires a plaintiff such as Mr. Solomon to return or offer to return the consideration received as a condition precedent to seeking rescission of a release.

### IV.

Complaints are subject to summary dismissal if the plaintiff, after being given a reasonable opportunity, has failed to establish an essential element of its case on which it will bear the burden of proof at trial. *Stanley v. Joslin,* 757 S.W.2d 328, 330 (Tenn.Ct.App.1987); *Moman v. Walden,* 719 S.W.2d 531, 533 (Tenn.Ct.App. 1986).

■ If he is to set the release aside, Mr. Solomon must show that he has returned or offered to return the consideration he received from the defendants. He concedes that he has not done so because he has used the money to support his family. However, he insists that the offer in his complaint to credit the $81,000 toward any judgment he might obtain against the defendants satisfies the tender requirement.

Offering a credit against a non-existent judgment does not restore the defendants to their original position. While Alabama's courts have not decided this precise question, the Tennessee Supreme Court has held that offering a credit on a potential recovery does not satisfy the tender requirement. *Lane v. Dayton Coal & Iron Co.,* 101 Tenn. 581, 585–86, 48 S.W. 1094, 1095 (1899). We have no basis to conclude that Alabama's courts would disagree with this conclusion. Therefore, we agree with the trial court's conclusion that Mr. Solomon has failed to establish an essential element of his case—that he has returned or offered to return the consideration he received in exchange for signing the release he now seeks to rescind.

### V.

We need not reach Mr. Solomon's economic duress issues since our decision rests on his failure to return or offer to return the consideration he received. We affirm the trial court's decision to grant a summary judgment and remand the case for whatever further proceedings may be required. The costs of the appeal will be taxed to John Solomon and his surety for which execution, if necessary, may issue.

CANTRELL and FRANKS, JJ., concur.